FILED

2017 Mar-16  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM ERNEST TRAYWICK,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:15-CV-02135-MHH** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff William Ernest Traywick seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Traywick's claims for a period of disability and disability insurance benefits and supplemental security income. After careful review, the Court remands the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Mr. Traywick applied for a period of disability and disability insurance benefits and supplemental security income on June 9, 2014.  (Doc. 7-7, pp. 2–12).[1]

---

[1] The ALJ stated that Mr. Traywick applied for benefits on June 2, 2014.  (Doc. 7-3, p. 21).  Mr. Traywick's applications for disability insurance benefits and supplemental security income are dated June 9, 2014.  (Doc. 7-7, pp. 2, 6).  The discrepancy is immaterial to the Court's analysis.

Mr. Traywick alleges that his disability began on September 20, 2013.   (Doc. 7-3, p. 74; Doc. 7-7, p. 46).[2]   The Commissioner initially denied Mr. Traywick's claims on July 17, 2014.  (Doc. 7-5, pp. 2–11).   Mr. Traywick requested a hearing before an Administrative Law Judge (ALJ).   (Doc. 7-5, p. 12). The ALJ issued an unfavorable decision on April 22, 2015.  (*See* Doc. 7-3, p. 21; Doc. 7-5, p. 94).

On June 8, 2015, Mr. Traywick's attorney requested that the ALJ "reopen and/or revise the unfavorable decision based on new evidence vital to Mr. Traywick's allegations of debilitating back pain" and an error in a treatment note from one of Mr. Traywick's treating physicians, Dr. Lloyd Johnson III.  (Doc. 7-5, pp. 94–95).   The ALJ reopened the initial unfavorable decision pursuant to 20 C.F.R. §§ 404.988 and 416.1488.   (Doc. 7-3, p. 21).   The ALJ reviewed Mr. Traywick's additional evidence and a modified treatment note from Dr. Johnson. (Doc. 7-3, p. 21).  The ALJ conducted a supplemental hearing on July 23, 2015. (Doc. 7-3, pp. 5–70).  The ALJ issued another unfavorable decision on August 13, 2015.   (Doc. 7-3, pp. 18–34).   On September 23, 2015, the Appeals Council declined Mr. Traywick's request for review (Doc. 7-3, pp. 2–5), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. §§ 405(g) and 1383(c).

---

[2] Mr. Traywick originally alleged that his disability began on June 1, 2012.  (Doc. 7-7, pp. 2, 6). Mr. Traywick later amended his alleged onset date to September 20, 2013.  (Doc. 7-7, p. 46).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.   "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"   *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.   "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).   In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.   *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings."   *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards.   If the Court finds an error in

the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Traywick has not engaged in substantial gainful activity since September 20, 2013, the alleged onset date. (Doc. 7-3, p. 24). The ALJ determined that Mr. Traywick suffers from the following severe impairments: degenerative disc disease of the lumbar and thoracic spine, lumbar radiculopathy, atrial flutter, and history of spinal surgeries. (Doc. 7-3, p. 24). The ALJ found that Mr. Traywick suffers from the following non-severe impairments: hypertension, mild obstructive arterial disease in the left leg, a history of kidney

4

stones, minimal scoliosis, and history of laparoscopic cholecystectomy.  (Doc. 7-3, p. 24).  Based on a review of the medical evidence, the ALJ concluded that Mr. Traywick does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 7-3, p. 24).

In light of Mr. Traywick's impairments, the ALJ evaluated Mr. Traywick's residual functional capacity.  The ALJ determined that Mr. Traywick has the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he would be required to have a sit/stand option with the retained ability to stay on or at a work station in no less than 30 minute increments each without significant reduction of remaining on task and he is able to ambulate short distances up to 50 yards per instance on flat[,] hard surfaces.  He is able to occasionally use foot controls bilaterally and can frequently reach overhead bilaterally. He can occasionally climb ramps and stairs but never climb ladders or scaffolds.  He can frequently balance, but can only occasionally stoop, and never crouch, kneel, or crawl. The claimant should never be exposed to unprotected heights, dangerous machinery, dangerous tools, hazardous processes, or operate commercial motor vehicles.  He can tolerate occasional exposure to vibration and in addition to normal workday breaks, he would be off-task five percent of an eight-hour workday, in non-consecutive minutes.

(Doc. 7-3, pp. 24–25).  Based on this RFC and testimony from a vocational expert, the ALJ concluded that Mr. Traywick is not able to perform his past relevant work as a construction laborer, construction worker I, forklift operator, heavy equipment operator, or dump truck driver.  (Doc. 7-3, pp. 32–33).  Relying on testimony from

a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Traywick can perform. (Doc. 7-3, p. 33). Those jobs include bench and table worker, surveillance system monitor, and telephone quote clerk. (Doc. 7-3, pp. 33–34). Accordingly, the ALJ determined that Mr. Traywick has not been under a disability within the meaning of the Social Security Act. (Doc. 7-3, p. 34).

## IV.   ANALYSIS

Mr. Traywick argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate the credibility of Mr. Traywick's complaints of pain consistent with the Eleventh Circuit's pain standard. The Court agrees.[3]

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Commissioner of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard is

---

[3] Mr. Traywick also alleges that the ALJ did not give adequate weight to the opinion of Mr. Traywick's treating physician, Dr. Lloyd Johnson III, or the opinion of one-time consultative examiner, Dr. Harold Settle. (Doc. 11, pp. 10–13). Because the Court finds Mr. Traywick's first argument meritorious, the Court will not address these additional issues.

"itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).  When evaluating a claimant's subjective symptoms, the ALJ may consider a range of factors, such as: (1) the claimant's daily activities; (2) the nature and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) effects of medications; (5) treatment or measures taken by the claimant for relief of symptoms; and (6) other factors concerning functional limitations. *Moreno v. Astrue*, 366 Fed. Appx. 23, 28 (11th Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)).  If the ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.  "While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough . . . ." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam).

During his initial hearing on March 23, 2015, Mr. Traywick testified that he could not work because of back and leg pain.  (Doc. 7-3, p. 88).  Mr. Traywick testified that from "eight in the morning until five in the afternoon" he needs to lie down three to four times a day "anywhere from an hour to [an] hour and a half" at a time.  (Doc. 7-3, p. 102).  Mr. Traywick testified that he has "issues with traveling and being able to get around [] day to day."  (Doc. 7-3, p. 88).  Mr. Traywick estimated that he drives "three to five times a week" and that he limits

his trips "to the store and home" because "[i]t hurts" to drive.  (Doc. 7-3, p. 79).

Mr. Traywick stated that he does not "travel far because of back issues affecting

[his] legs."  (Doc. 7-3, p. 79).

Mr. Traywick described his pain as "[g]eneral misery" and "constant."

(Doc. 7-3, p. 92).  Mr. Traywick explained that his pain "starts out as burning pain

from [his] back down [his] left leg and grows" into "grinding, numbness pain" that

occurs "at least three days a week."  (Doc. 7-3, pp. 92–93).  Mr. Traywick testified

that standing for 15 to 20 minutes causes "pain and discomfort."  (Doc. 7-3, p. 94).

Mr. Traywick testified that he could lift a gallon of milk but not a case of soda.

(Doc. 7-3, p. 95).  Mr. Traywick is able to do some basic chores, and he "pick[s]

up limbs" around the yard.  (Doc. 7-3, pp. 96–99).

Mr. Traywick takes prescription medication including "oxycodone to

Naprosyn to Tramadol and . . . some hypertension medicines," but he testified  that

they do not work.  (Doc. 7-3, pp. 88–89).  Mr. Traywick testified that "within 15

minutes of taking [his medication] if [he does not] lay down and go to sleep [he

will get] sick and throw up."  (Doc. 7-3, p. 89).

During the supplemental hearing on July 23, 2015, Mr. Traywick testified

that he tried to go back to work by cleaning yards and pulling weeds.  (Doc. 7-3, p.

64).  Mr. Traywick worked three four-hour days before he fell on a rock and hurt

his back.  (Doc. 7-3, p. 64).  After the fall, Mr. Traywick experienced a bulging

disc that "elevated [his] pain ratings." (Doc. 7-3, pp. 64–65). Mr. Traywick explained that when he "physically [tries] to do something, [his] back swells up and inflames the nerves in [his] left leg and it impairs [his] ability to walk and [he] trip[s] and fall[s] over stuff easy." (Doc. 7-3, p. 67). Mr. Traywick testified that his condition has not improved, and he explained that if the "pain management" treatment he was scheduled to receive did not help, then he would opt for surgery. (Doc. 7-3, p. 65).

The ALJ summarized Mr. Traywick's testimony concerning his back and leg pain. (Doc. 7-3, pp. 25–26).[4] The ALJ properly recited the pain standard by finding that Mr. Traywick's "medically determinable impairments could reasonably be expected to cause many of the alleged symptoms." (Doc. 7-3, p. 31). After summarizing Mr. Traywick's medical record, the ALJ concluded that Mr. Traywick's "statements concerning the intensity, persistence and limiting effects" of the symptoms were not credible. (Doc. 7-3, p. 31). The ALJ stated:

> [i]n terms of the claimant's alleged severe back pain and physical limitations arising from his back, the medical evidence of record shows that the claimant has degenerative changes in his lumbar and thoracic spine, but does not show nerve impingement or serious spinal stenosis, thus, the medical evidence of record does not support claimant's allegations of severe physical limitations arising from moderately severe to severe pain []. Reasonably, the claimant does have back impairments that would cause some limitations and pain, though reasonably, not to the extent he alleges. The claimant's disc

---

[4] Mr. Traywick does not challenge the ALJ's credibility findings with respect to his atrial flutter or his mental limitations. (*See* Doc. 11, pp. 4–10).

bulge at L5-S1 causes mild posterior displacement of the S1 nerve root sleeve, which could reasonably cause generally minor symptoms, but this is inconsistent with the claimant's allegations of chronic disabling pain [].  Indeed, none of his spinal doctors ever opined that he had permanent severe limitations or that he would be permanently unable to engage in work activities [].  Indeed, it was frequently reported that his sensation was intact, muscle strength was normal, and he had no motor problems.  Despite one notation of positive straight leg raising, a subsequent treatment note reported that it was negative, and other subsequent notes do not show positive straight leg raising [].  Notably, despite the claimant's repeated allegations of severe pain, Dr. Johnson prescribed some pain medication, performed some injections, recommended more exercise, and specifically recommended against any surgery for his condition [].  Multiple diagnostic scans were reported to show some degenerative disc disease and a disc bulge, possibly two, with some generally minor scar tissue formation.  More importantly, his many x-rays and MRI[]s did not show any disc herniations, nerve impingement, or spinal stenosis.

(Doc. 7-3, p. 31) (internal citations omitted).

Substantial evidence does not support the ALJ's interpretation of Mr. Traywick's medical records.  Objective medical evidence in Mr. Traywick's treatment notes is consistent with his subjective pain testimony.

On May 7, 2014, Mr. Traywick began treatment with Dr. Lloyd Johnson, III at the Alabama Bone & Joint Clinic.  (Doc. 7-9, p. 42).  Mr. Traywick complained of lower back pain that had been present for over 10 years.  (Doc. 7-9, p. 42).  He rated his pain at a level 7 out of 10 and described his symptoms as "constant, aching, pressure, radiating and electrical."  (Doc. 7-9, p. 42).  Dr. Johnson noted that Mr. Traywick had two previous back surgeries: a lumbar discectomy in 1999

and a revision discectomy in January 2000.  (Doc. 7-9, p. 42).  Dr. Johnson stated that Mr. Traywick had "been unable to work for about 18 months."  (Doc. 7-9, p. 42).

A lumbar spine examination showed a positive straight leg raise test on the left, but negative on the right.  (Doc. 7-9, p. 43).  Mr. Traywick had "diffuse tenderness [in the] mid to lower lumbar region . . . significant limitation to full lumbar range of motion which causes pain . . . [and] decreased sensation [in the] left leg as compared to right."  (Doc. 7-9, p. 43).  Mr. Traywick had no focal deficits in either leg, his lumbar alignment was normal, and his lumbar scar was well-healed.  (Doc. 7-9, p. 43).

A thoracic spine examination found "limited thoracolumbar range of motion" but no tenderness to palpation and "[s]trength testing 5/5 in all areas tested."  (Doc. 7-9, p. 43).  Imaging showed "degenerative disease L4-5 and L5-S1" and "degenerative changes [in the] mid and lower thoracic region."  (Doc. 7-9, p. 43).  Dr. Johnson prescribed physical therapy, a Medrol Dosepak, and Naprosyn, and he instructed Mr. Traywick to follow up in three weeks.  (Doc. 7-9, p. 43).

During a visit with Dr. Johnson on June 4, 2014, Mr. Traywick complained that his symptoms had "worsened since the last visit," and he rated his pain on the left side as 10 out of 10.  (Doc. 7-9, p. 33).  Mr. Traywick complained that his back pain was "greater than [his] leg pain."  (Doc. 7-9, p. 33).  Mr. Traywick reported

that he could do light yard work, but it caused him pain.  (Doc. 7-9, p. 33).  Mr. Traywick stated he did not go to physical therapy because the physical therapy office did not call him back.  (Doc. 7-9, p. 33).  Dr. Johnson called the physical therapy office and learned that Mr. Traywick received a call from the physical therapy office, but he did not respond.  (Doc. 7-9, p. 33).

A lumbar spine examination showed "pain with simulated rotation and with axially loading the shoulders."  (Doc. 7-9, p. 33).  Mr. Traywick "grimace[d] throughout the evaluation."  (Doc. 7-9, p. 33).  Dr. Johnson noted that Mr. Traywick was "able to feel light touch in both legs," and Dr. Johnson found "no focal motor deficits in either leg."  (Doc. 7-9, p. 33).  A thoracic spine examination showed "diffuse tenderness of the thoracic spine."  (Doc. 7-9, p. 33).

Dr. Johnson ordered an MRI of the thoracic spine and the lumbar spine with and without contrast.  (Doc. 7-9, p. 33).  Dr. Johnson recommended that Mr. Traywick discontinue nicotine use because it "can lead to ongoing degenerative disc disease," and Dr. Johnson prescribed Ultram.  (Doc. 7-9, pp. 33–34).

Mr. Traywick underwent the MRI of his spine on June 12, 2014.  (Doc. 7-9, p. 45).  The MRI showed "moderate disc desiccation and mild disc space narrowing" and "broad-based disc bulge at L4-5 with some epidural fibrotic enhancement around the thecal sac."  (Doc. 7-9, p. 45).  The MRI showed "no definite findings to indicate recurrent disc herniation."  (Doc. 7-9, p. 45).

On June 15, 2014, Mr. Traywick saw physician's assistant Vinny Baglini, PA-C at the Shelby Baptist Medical Center and complained of back pain that shoots down his legs. (Doc. 7-10, p. 67). Mr. Traywick also complained of neck pain associated with an injury he suffered three or four days earlier when a tree branch hit his neck. (Doc. 7-10, p. 67). Mr. Baglini stated that Mr. Traywick's back pain "is a chronic problem." (Doc. 7-10, p. 67). Mr. Traywick tested positive for a straight leg raise on the left but negative on the right, and he exhibited tenderness in his lumbar spine. (Doc. 7-10, p. 69). Mr. Baglini diagnosed Mr. Traywick with chronic back pain, left-sided sciatica, and neck strain, and prescribed Prednisone, Orphenadrine, and Meloxicam. (Doc. 7-10, pp. 69–71).

Mr. Traywick saw Dr. Johnson on July 15, 2014 and complained of back pain that "radiates down his left leg." (Doc. 7-10, p. 84). Mr. Traywick stated that his "symptoms had worsened since his last visit," and he rated the pain on his left side as 9 out of 10. (Doc. 7-10, p. 84). Dr. Johnson stated that the pain involves Mr. Traywick's left thigh and calf. (Doc. 7-10, p. 84). Dr. Johnson explained that Mr. Traywick's "[p]ain is sharp. It is worse with any bending and lifting and twisting. It bothers him daily. Limits his activity." (Doc. 7-10, p. 84). Dr. Johnson reported that Mr. Traywick "has been unable to work for 18 months." (Doc. 7-10, p. 84). Mr. Traywick told Dr. Johnson that he received a left L5 selective nerve root block on July 3, 2014, but the block "did not help." (Doc. 7-

10, p. 84).   Mr. Traywick stated that his back pain "bothers him daily and is debilitating."  (Doc. 7-10, p. 84).

> A lumbar spine examination showed:
>
> a well-healed lumbar incision.   No redness or warmth. Positive straight leg raise on the left, negative on the right. Able to feel light touch in both legs.  There is weakness to left hip flexors secondary to pain.  No other focal motor deficits in either leg.  Both legs are warm and well perfused.

(Doc. 7-10, p. 84).   A thoracic spine examination revealed "normal thoracic alignment," but Dr. Johnson stated that Mr. Traywick has "significantly limited thoracolumbar range of motion" and "is able to flex to about 30° . . .  lacks 10° from neutral," and "[h]is back is very sore and spasms today."  (Doc. 7-10, p. 85). Dr. Johnson ordered a left L4 and left L5 selective nerve root block.  (Doc. 7-10, p. 85).  Dr. Johnson "discussed alternatives including observation, or surgery," but Mr. Traywick was "not interested in surgery" at the time.  (Doc. 7-10, p. 85). Regarding Mr. Traywick's ability to work, Dr. Johnson stated that "[Mr. Traywick] will be off of work.  I do not think he is able to work at this time.  His pain is severe.  He has difficulty even standing up straight at this point.  He has pain from his back that radiates down the leg."  (Doc. 7-10, p. 85).

During an August 12, 2014 visit with Dr. Johnson, Mr. Traywick complained of lower back pain that extended into his left leg.  (Doc. 7-11, p. 47). Dr. Johnson noted that "there [had] been no significant changes in [Mr.

Traywick's] current symptoms." (Doc. 7-11, p. 47). Mr. Traywick was "limping significantly." (Doc. 7-11, p. 47). Mr. Traywick reported that the pain on his left side was 8 out of 10. (Doc. 7-11, p. 47). Mr. Traywick explained that a left L4 and left L5 nerve root block performed on July 22, 2014 only "helped for about 36 hours." (Doc. 7-11, p. 47). Dr. Johnson noted that Mr. Traywick's back and left leg pain "is worse with ambulation [and] better with rest." (Doc. 7-11, p. 47). A lumbar spine examination showed "[n]o redness or warmth" but "tenderness both on the left and the right side in the mid to lower lumbar region." (Doc. 7-11, p. 47). Mr. Traywick had a positive straight leg raise on the left. (Doc. 7-11, p. 47). He was "able to feel light touch [in] both legs" and had "no focal motor deficits in either leg." (Doc. 7-11, p. 47). Dr. Johnson reported that Mr. Traywick ambulated with a limp and that "there [was] some groin pain with left hip range of motion." (Doc. 7-11, p. 47).

Dr. Johnson proposed surgery as a potential option to remove scar tissue, but Mr. Traywick did not want to consider surgery. (Doc. 7-11, p. 47). Dr. Johnson ordered an "MRI scan of the left hip to rule out hip pathology as a source of [Mr. Traywick's] pain." (Doc. 7-11, p. 47). Dr. Johnson also suggested that:

> Mr. Traywick may consider getting a disability attorney. His problem is [it is] hard even to drive because of the pain. He has to adjust position frequently to get comfortable. As a result it is hard to hold any employment. [H]e had work restrictions since his work injury 15 years ago. He was told he was "40% disabled at that time."

15

(Doc. 7-11, p. 48).

On August 26, 2014, Mr. Traywick visited Dr. Johnson and rated the pain on his left side as 10 out of 10. (Doc. 7-11, p. 42). Mr. Traywick reported that his severe "pain limits his activity." (Doc. 7-11, p. 42). Dr. Johnson reviewed the MRI scan of Mr. Traywick's pelvis and found no sign of hip pathology, but he did see "degenerative disc disease L4-5 and L5-S1" with "some scar tissue formation with laminotomy on the left at L4-5." (Doc. 7-11, p. 42). Dr. Johnson referred Mr. Traywick to pain management and ordered physical therapy. (Doc. 7-11, p. 42). Dr. Johnson noted that he did "not see anything [he] could do surgically to reliably diminish [Mr. Traywick's] leg pain." (Doc. 7-11, p. 42).

Also on August 26, 2014, Mr. Traywick saw his primary care doctor at Childersburg Primary Care, Dr. Jarod Speer. (Doc. 7-11, pp. 7–9). Mr. Traywick complained of "lower back pain from [an] old injury." (Doc. 7-11, p. 7). Dr. Speer noted that Dr. Johnson had been treating Mr. Traywick's back pain. (Doc. 7-11, p. 7). Dr. Speer reported that Mr. Traywick recently took Ultram for his back pain, but it did not provide "much relief." (Doc. 7-11, p. 7). Mr. Traywick also had been taking morphine, but he complained that the morphine was "too strong." (Doc. 7-11, p. 7). Mr. Traywick stated that the nerve blocks he had received provided no relief. (Doc. 7-11, p. 7). Dr. Speer reported normal neurologic findings, except Dr. Speer stated that Mr. Traywick "walks with a

lim[p]" and has "stooped over posture due to pain." (Doc. 7-11, p. 8). Dr. Speer noted that at the time, Mr. Traywick was working full-time, and he occasionally walked or did other light activity for exercise. (Doc. 7-11, p. 8). Dr. Speer diagnosed Mr. Traywick with degenerative disc disease and prescribed Percocet and Zanaflex. (Doc. 7-11, p. 8).

Mr. Traywick visited Dr. Speer on September 15, 2014 for a check-up and complained of a reaction to Percocet. (Doc. 7-11, p. 5). Dr. Speer noted that Mr. Traywick would be "followed by ortho and will see pain management soon." (Doc. 7-11, p. 5). Dr. Speer did not examine Mr. Traywick's back during this visit, but Dr. Speer diagnosed Mr. Traywick with "chronic pain." (Doc. 7-11, p. 6). Dr. Speer prescribed Lyrica, recommended follow up "with ortho or pain management," and scheduled a return appointment in three months. (Doc. 7-11, p. 6).

Mr. Traywick returned to Dr. Speer on September 26, 2014 and complained of back pain and an irregular heartbeat. (Doc. 7-11, p. 3). Dr. Speer noted that Mr. Traywick's MRI showed no degenerative disc disease. (Doc. 7-11, p. 3). Dr. Speer diagnosed "chronic pain" and encouraged Mr. Traywick to "call and pursue pain management" and to continue his medications. (Doc. 7-11, p. 4). Dr. Speer's September 26, 2014 treatment note contains no back examination findings. (Doc. 7-11, pp. 3–4).

On February 2, 2015, the Disability Determination Service referred Mr. Traywick to Dr. Harold P. Settle for a disability evaluation regarding a "history of cardiac tachyarrhythmia." (Doc. 7-12, p. 2). Dr. Settle completed a medical source statement and found no cardiovascular limitations, but he did determine that Mr. Traywick has several postural limitations because of Mr. Traywick's back pain. (Doc. 7-12, pp. 2–9). Dr. Settle opined that Mr. Traywick can sit, stand, and walk for one hour at a time without interruption. (Doc. 7-12, p. 5). Dr. Settle opined that Mr. Traywick can sit for one hour, stand for one hour, and walk for one hour in an 8-hour work day. (Doc. 7-12, p. 5). Dr. Settle found that Mr. Traywick can occasionally operate foot controls with his left and right feet and that he can frequently perform the following activities: reaching, handling, fingering, feeling, and pushing/pulling. (Doc. 7-12, p. 6). Dr. Settle also found that Mr. Traywick can never climb ladders or scaffolds, crouch, or crawl, but he can occasionally climb stairs and ramps, balance, stoop, and kneel. (Doc. 7-12, p. 7).

On February 6, 2015, Mr. Traywick returned to Dr. Speer and complained of chronic back pain that is steady and exacerbated by movement. (Doc. 7-12, p. 12). Mr. Traywick told Dr. Speer that "ortho is now telling [me] that they [will not] refer [me] to pain management and 'that is [my primary care physician's] job.'" (Doc. 7-12, p. 12). Mr. Traywick stated that "ortho made one attempt to refer to pain management but [that] they never contacted [him]." (Doc. 7-12, p. 12). A

back exam revealed that Mr. Traywick's spine was "normal without deformity or tenderness," and Mr. Traywick had a normal range of motion. (Doc. 7-12, p. 13). Dr. Speer stated that he would refer Mr. Traywick to pain management, and he encouraged Mr. Traywick to follow up with his orthopedic doctor. (Doc. 7-12, p. 13). Dr. Speer prescribed Zanaflex, Lyrica, Metoprolol Succinate ER, and Percocet. (Doc. 7-12, p. 13).

Mr. Traywick followed up with Dr. Johnson on February 10, 2015. (Doc.7-12, p. 16). Mr. Traywick reported that his "symptoms [had] worsened since the last visit." (Doc. 7-12, p. 16). Mr. Traywick rated his back pain as a 7 out of 10. (Doc. 7-12, p. 16). Under the "lumbar spine examination" and "thoracic spine examination" headings, Dr. Johnson wrote: "Examination today reveals definite improvement with no new problems or positive findings." (Doc. 7-12, p. 16). On June 1, 2015, Dr. Johnson submitted a letter and a finalized report explaining that the original February 10, 2015 treatment note was incorrect. (Doc. 7-12, p. 19). Dr. Johnson's letter stated:

> I recently had an appointment with the patient. The patient brought [his] file from his disability hearing. He asked me to review it. I noted that there was an error in the file.
>
> The electronic medical record that we use generates a pending note when we see the patient that must be finalized. The pending note is generated based on test[s] that we ordered, medications that we order, and information that the patient provides to the nurse, as well as the diagnosis selected. The doctor then goes in and reviews the note and makes additions and corrections [] before finalizing the note.

Occasionally, the pending note will still be visible in the medical record.  It appears that the pending note was sent to the disability hearing instead of the finalized copy.  I have included a copy of the pending note with the finalized note as well.  As you can see, I added additional history prior to finalizing the note.  In addition[,] I added a physical examination.  The electronic medical record automatically includes the statement, "examination today reveals definite improvement with no new problems or positive findings" until the physician enters [an exam] as a placeholder.  As you can see from the finalized note, the patient had decreased sensation in the left calf.  Motor function was [i]ntact.  He was tender in the lumbar region.  Please let me know if you need any additional information.

(Doc. 7-12, p. 19).

Dr. Johnson's revised February 10, 2015 treatment note states "[t]he patient has decreased sensation in the left calf. Sensation intact in the right. Motor function intact in both legs. The patient does groan and [grimace] during the evaluation. Tenderness diffusely in the lumbar region."  (Doc. 7-12, p. 21).  Dr. Johnson prescribed a Medrol Dosepak, and he recommended a home exercise program and "ongoing pain management through [Mr. Traywick's] primary care physician." (Doc. 7-12, p. 22).[5]

On May 12, 2015, Dr. Johnson saw Mr. Traywick for a "flare of [Mr. Traywick's] low back pain."  (Doc. 7-12, p. 57).  Under a "history of present illness" heading, Dr. Johnson stated:

--------

[5] Mr. Traywick's attorney requested that the ALJ reopen his initial unfavorable decision based in part on this revised medical record that Dr. Johnson submitted on Mr. Traywick's behalf.  (*See* Doc. 7-5, pp. 94–95).

> [p]ain will radiate down both legs.  The back pain is much more
> severe than the leg pain is.  The patient has had therapy in the past for
> his back.  When he gets leg pain, it is worse on the left than it is on the
> right. The pain will go into the left buttock thigh and calf. He has
> some pain in the right thigh, usually stopping at the knee.

(Doc. 7-12, p. 57).   Mr. Traywick had "tenderness in the mid to lower lumbar

region" and positive straight leg raise on the left and right.  (Doc. 7-12, p. 57).  Dr.

Johnson injected trigger points on the left and right side with 1cc Betamethasone

6mg/mL mixed with Marcaine.  (Doc. 7-12, pp. 57–58).  Dr. Johnson stated that

Mr. Traywick should begin at-home pool therapy and that he should keep his

appointment with the pain clinic.  (Doc. 7-12, p. 58).  Dr. Johnson stated that he

would consider ordering a new lumbar MRI if Mr. Traywick's condition did not

improve.  (Doc. 7-12, p. 58).

On May 22, 2015, Mr. Traywick reported to Coosa Valley Medical Center

for treatment for back pain after he fell on a rock.  (Doc. 7-12, p. 26).  An exam

showed "left si[de] joint tenderness [and] sacral tenderness."  (Doc. 7-12, p. 26).

Mr. Traywick had a full range of motion in his extremities.  (Doc. 7-12, p. 26).

The attending physician and nurse practitioner diagnosed back pain, sciatica, and

coccyx contusion, and they prescribed Meloxicam, Metoprolol, and Robaxin.

(Doc. 7-12, p. 27).  Mr. Traywick was instructed to follow  up with his primary

care physician if his symptoms worsened.   (Doc. 7-12, p. 27).

Mr. Traywick saw Dr. Speer on May 26, 2015 because his back pain "continu[ed] to get worse."  (Doc. 7-12, p. 41).  Dr. Speer reported normal back examination findings "except mild/moderate [tenderness to palpation] in lower back area." (Doc. 7-12, p. 42).  Mr. Traywick had a normal gait and negative straight leg raise. (Doc. 7-12, p. 42).  Dr. Speer stated that Mr. Traywick had an appointment scheduled with pain management in July.  (Doc. 7-12, p. 42).  Dr. Speer explained that advanced imaging may be necessary if Mr. Traywick's pain persisted.  (Doc. 7-12, p. 42).

On May 29, 2015, Mr. Traywick saw Dr. Johnson.  (Doc. 7-12, p. 49).   Mr. Traywick stated that his "symptoms [had] worsened since the last visit." (Doc. 7-12, p. 49).  He rated his pain at a level 10 out of 10.  (Doc. 7-12, p. 49).  Mr. Traywick described the pain as "sharp and constant."  (Doc. 7-12, p. 49).  Mr. Traywick reported that he "slipped in a creek and fell on May 14" and "was diagnosed with a contusion of his coccyx." (Doc. 7-12, p. 49).  Dr. Johnson's lumbar spine examination showed: "[n]ormal thoracolumbar alignment. Tenderness [in the] mid to lower lumbar region.  Mild tenderness over the sacrum and coccyx.  No groin pain with right left hip range of motion.  Motor sensory function intact in both legs."  (Doc. 7-12, p. 49).  Mr. Traywick had "normal thoracic alignment" but a "slow gait." (Doc. 7-12, p. 49).  Imaging showed "no right or left hip fracture or arthritic change" and "[m]inimal scoliosis.

Degenerative disc disease L4-L5." (Doc. 7-12, p. 49). Imaging also showed "no evidence of a coccygeal or sacral fracture." (Doc. 7-12, p. 49). Dr. Johnson ordered physical therapy for Mr. Traywick and noted that Mr. Traywick had a pain management appointment scheduled on July 25, 2015. (Doc. 7-12, p. 50). Dr. Johnson stated that he would order a lumbar MRI scan if Mr. Traywick's condition did not improve. (Doc. 7-12, p. 50).

Mr. Traywick also saw Dr. Speer on May 29, 2015. (Doc. 7-12, p. 39). Mr. Traywick complained of "acute" and "chronic low back pain" that was "[]aggravated again today with [a] car ride." (Doc. 7-12, p. 39). Mr. Traywick reported that his "pain radiates into [his] leg." (Doc. 7-12, p. 39). Dr. Speer noted "normal" back examination findings except Mr. Traywick's lumbar spine was "[tender to palpation]," and Mr. Traywick was "flexed over due to pain." (Doc. 7-12, p. 40). Dr. Speer prescribed Toradol and Prednisone, and he recommended that Mr. Traywick continue his other medication, including muscle relaxers and Percocet. (Doc. 7-12, p. 40).

On June 15, 2015, Mr. Traywick saw Dr. Johnson again. (Doc. 7-12, p. 45). Mr. Traywick reported that his pain was a level 10 out of 10. (Doc. 7-12, p. 45). Dr. Johnson noted a straight leg raise assessment bilaterally, pain with torque lumbar range of motion, and limited thoracolumbar range of motion secondary to back pain. (Doc. 7-12, p. 45). Dr. Johnson reviewed the results of Mr. Traywick's

most recent MRI.  (Doc. 7-12, p. 45).  The MRI revealed a "bulge L4-5 centrally to the left of midline with enhancing fibrotic scar.  No recurrent herniation noted. Broad-based bulge at L5-S1.  No interval change compared to June 12, 2014." (Doc. 7-12, p. 45).  Dr. Johnson prescribed Percocet.  (Doc. 7-12, p. 45).  He did not recommend surgery, but he explained that if Mr. Traywick did not improve with pain management, then Mr. Traywick should follow up to discuss surgical options.  (Doc. 7-12, pp. 45–46).

The ALJ discounted Mr. Traywick's reports of severe pain largely because imaging of Mr. Traywick's spine provided little to no objective evidence to substantiate Mr. Traywick's description of his back pain.  (Doc. 7-3, p. 31).  The ALJ also based his conclusion on the fact that Dr. Johnson "specifically recommended against surgery" for Mr. Traywick's back condition.  (Doc. 7-3, p. 31).  Both observations are correct, but they do not supply substantial evidence to support the ALJ's decision.

Although Mr. Traywick's x-rays and MRIs provide no objective medical evidence of conditions that would cause severe pain, the record contains objective medical evidence such as findings of tenderness in the lumbar region, limping, and stooped posture.   Both Mr. Traywick's orthopedist and his general physician accepted Mr. Traywick's description of his pain and routinely prescribed pain medication for Mr. Traywick.   Mr. Traywick's orthopedist, Dr. Johnson,

recommended against surgery because he did not believe that surgery would resolve Mr. Traywick's pain.  The record contains no statement by a doctor indicating that Mr. Traywick's back or leg pain was less severe than he described, and there is no indication that Mr. Traywick's description of his daily activities was inaccurate.  *See* SSR 96-7P 1996 WL 374186 at \*7 ("In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense or persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements."); *see also Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988) ("[T]he record is replete with evidence of a medical condition that could reasonably be expected to produce the alleged pain. No examining physician ever questioned the existence of appellant's pain. They simply found themselves unable to cure the pain."); *Edwards v. Barnhart*, 319 F. Supp. 2d 1283, 1290 (N.D. Ala. 2004) (finding that substantial evidence did not support the ALJ's analysis of the claimant's subjective testimony because the testimony was "well supported by objective medical evidence (MRI, decreased ROM, tenderness, abnormal gait, decreased strength, atrophy, positive straight leg raise) of underlying conditions which could reasonably be expected to produce her pain").

Accordingly, substantial evidence does not support the ALJ's decision to discredit Mr. Traywick's testimony regarding his back and leg pain, and the Court will remand this action to the Commissioner. *Powell v. Astrue*, 250 Fed. Appx. 960, 964–65 (11th Cir. 2007) ("[B]ecause neither of the ALJ's reasons for discrediting Powell's incontinence testimony amounts to substantial evidence supporting his decision to reject that testimony, we must remand this case so that the ALJ can re-assess the effect of Powell's claimed incontinence after either accepting her testimony or by articulating an adequate reason to reject it.").

## V.    CONCLUSION

For the reasons discussed above, the Court remands the decision of the Commissioner for reevaluation of the subjective testimony as it relates to Mr. Traywick's back and leg pain.  The Court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 16, 2017.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE